UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                :

JASON N. SCORAN,

                                :

                   Plaintiff,         :        07 Civ. 10307 (DF)

                                :

        -against-           :        **MEMORANDUM**

                                :        **AND OPINION**

OVERSEAS SHIPHOLDING GROUP, INC., et al.,

                                :

                   Defendants.
------------------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

      In this Jones Act case, before me on consent pursuant to 28 U.S.C. § 636(c), plaintiff

Jason N. Scoran ("Plaintiff") alleges that he suffered a compound leg fracture and other injuries

when, during the course of his employment aboard a ship (the "Overseas New Orleans") and

while attempting to clean one of the ship's fuel tanks, he fell approximately 35 feet into a hole in

the tank that was not protected with railings.  Plaintiff has moved for partial summary judgment

(Dkt. 30), seeking dismissal of the first and sixth affirmative defenses asserted by defendants

Overseas Shipholding Group, Inc., OSG Ship Management, Inc., OSG Bulk Ships, Inc., and

New Orleans Tanker Corporation (collectively, "Defendants"), and a finding by the Court that

the vessel was unseaworthy as a matter of law.  For the reasons discussed below, Plaintiff's

motion for partial summary judgment is denied.

## BACKGROUND

A.   **Factual Background**[1]

At the time of his accident in 2006, Plaintiff was serving on the Overseas New Orleans as a Second Mate, a position for which he had held a United States Coast Guard ("U.S.C.G.") license since 1999.  (*See* Plaintiff's Amended Local Rule 56.1 Statement, dated Apr. 1, 2009 ("Pl. Rule 56.1 Stmt.") (Dkt. 31), at ¶¶ 1, 2; Defendants' Local Rule 56.1 Counterstatement of Material Facts, dated May 18, 2009 ("Def. Rule 56.1 Stmt.") (Dkt. 39), at ¶¶ 1, 2, 172.)  Plaintiff reported to Captain Walter Maznio ("Maznio") and Chief Mate Todd Crane ("Crane").  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 30, 32, 34; Def.  Rule 56.1 Stmt., at ¶¶ 30, 32, 34.)  According to Plaintiff, Crane, as the Chief Mate, was "responsible for supervising the junior deck officers, the third mate and the second mate, and the ship's crew, during cargo operations and maintenance operations, including tank washing, tank entry, tank repairs and tank cleaning."  (Pl. Rule 56.1 Stmt., at ¶ 36.)

On January 4, 2006, after completing several early-morning assignments, Plaintiff was directed by Crane to take breakfast, which lasted about 20 minutes.[2]  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 48-51; Def. Rule 56.1 Stmt., at ¶¶ 48-51.)  After breakfast, Crane next assigned Plaintiff to the

---

[1] The facts summarized herein are taken primarily from the parties' respective statements of undisputed material facts, submitted pursuant to Local Civil Rule 56.1, and the evidence cited therein.

[2] While the precise duration of Plaintiff's work shift is disputed, a work schedule signed by Maznio indicated that Plaintiff's work shift in the days preceding the accident ran from approximately 4:00 a.m. to 8:00 p.m., including multiple breaks.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 38, 127–29; Def. Rule 56.1 Stmt., at ¶¶ 38, 127-30; Amended Affidavit of Peter Riggs in Support of Motion for Summary Judgment, sworn to Apr. 1, 2009 ("Riggs Aff.") (Dkt. 32), Ex. L ("Crew Work Hours" sheet).)

task of entering the starboard tank, in order to position the machine used to clean that tank.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 22, 52-53; Def. Rule 56.1 Stmt., at ¶¶ 22, 52-53.)  The starboard tank was one of the three main "bunker tanks" on the Overseas New Orleans, and was used for the storage of fuel burned by the ship's engines.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 14-16; Def. Rule 56.1 Stmt., at ¶ 14-16.)  The bunker tanks were cleaned every few years – generally prior to the ship's entry into a shipyard for repairs and inspection – in order to remove any residual fuel films.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 18, 21; Def. Rule 56.1 Stmt., at ¶¶ 18, 21.)[3]  Tank cleaning was accomplished by positioning a so-called "Butterworth machine" at various points inside the tanks to spray the inside areas of the tanks with heated saltwater.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 22-23; Def. Rule 56.1 Stmt., at ¶¶ 22-23.)  The Butterworth machine weighed approximately 30 to 40 pounds and had to be moved across the four levels of the starboard bunker tank in order to clean the tank.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 25, 27-28; Def. Rule 56.1 Stmt., at ¶ 25, 27-28.)

The parties do not dispute that Crane initially supervised and instructed Plaintiff as to how to enter the tank to position the Butterworth machine (s*ee* Pl. Rule 56.1 Stmt., at ¶¶ 52-54; Def. Rule 56.1 Stmt., at ¶ 52-54), although Plaintiff suggests that Crane continued to supervise the cleaning effort even after Plaintiff entered the tank, while Defendant asserts that, at that point, Plaintiff took charge of the operation (*see* Pl. Rule 56.1 Stmt., at ¶ 58; Def. Rule 56.1 Stmt., at ¶ 58).

─────────────────

[3] The parties agree that the Overseas New Orleans entered a shipyard for maintenance and repairs every two to three years (*see* Pl. Rule 56.1 Stmt., at ¶ 157; Def. Rule 56.1 Stmt., at ¶ 157), and Defendants further state that the starboard bunker tank would typically have been entered every three to five years (*see* Defendants' Opposition to Plaintiff's Amended Motion for Summary Judgment, dated May 18, 2009 ("Def. Mem.") (Dkt. 35), at 15 (citing Declaration of Gregory W. O'Neill, dated May 18, 2009 ("O'Neill Decl.") (Dkt. 37), Ex. 10 (Declaration of Jay Bolton, dated May 15, 2009 ("Bolton Decl.")), at ¶¶ 12-13)).

In any event, in order to perform his assigned task, Plaintiff entered the starboard bunker tank through a manhole and descended the ladder to the first level of the tank. (*See* Pl. Rule 56.1 Stmt., at ¶ 69; Def. Rule 56.1 Stmt., at ¶ 69.) The only way to enter the starboard bunker was through the manhole, which also provided the only source of daylight in the tank. (*See* Pl. Rule 56.1 Stmt., at ¶¶ 70-71; Def. Rule 56.1 Stmt., at ¶¶ 70-71.) Samuel Duah ("Duah"), the boatswain on the vessel, was assigned to the task with Plaintiff, and entered the starboard bunker tank shortly after Plaintiff did. (*See* Pl. Rule 56.1 Stmt., at ¶ 78; Def. Rule 56.1 Stmt., at ¶ 78.) Plaintiff had a headlamp and a small flashlight, while Duah had a headlamp and a larger flashlight – which Duah described as being "like a spotlight" – that had been issued to him on the job. (*See* Pl. Rule 56.1 Stmt., at ¶¶ 73-74; Def. Rule 56.1 Stmt., at ¶¶ 73-74, 185-86; O'Neill Decl., Ex. 4 (Transcript of deposition of Samuel Duah, conducted December 10, 2008 ("Duah Dep.")), at 85-86.) Though Plaintiff and Duah were both given harnesses, hoists and other safety equipment, neither used this equipment, but rather left it on top of the tank. (*See* Pl. Rule 56.1 Stmt., at ¶ 120; Def. Rule 56.1 Stmt., at ¶ 120.[4])

The "swash hole" in the starboard bunker tank was not surrounded by railings, although railings had previously been installed around the swash hole in another bunker tank on the same ship, and the decision had been made to install such railings in the tank at issue while the ship was docked for maintenance. (*See* Pl. Rule 56.1 Stmt., at ¶¶ 63-65, 68, 140; Def. Rule 56.1 Stmt., at ¶¶ 63-65, 68, 140.) In the course of attempting to position the Butterworth machine in the starboard tank, Plaintiff fell into the swash hole opening, "estimated at about 8 feet by 8 feet,

---

[4] Defendants further maintain that, "as an officer and Second Mate, Plaintiff knew what equipment was necessary for cleaning the tank and if he did not have it, was responsible for requesting it." (Def. Rule 56.1 Stmt., at ¶ 120.)

that went all the way down to the bottom level of the tank." (Pl. Rule 56.1 Stmt., at ¶¶ 67, 82; Def. Rule 56.1 Stmt., at ¶¶ 67, 82.) Plaintiff fell between 35 and 40 feet, and "ended up in four to five feet of 'slops' at the bottom of the tank, a mixture of saltwater and oil that is produced" in the course of cleaning the tanks. (Pl. Rule 56.1 Stmt., at ¶¶ 84-85; Def. Rule 56.1 Stmt., at ¶¶ 84-85.) Plaintiff claims, and Defendants do not dispute, that his fall "caused, among other injuries, a compound fracture of his left leg." (Pl. Rule 56.1 Stmt., at ¶ 91; Def. Rule 56.1 Stmt., at ¶ 91.)

There were no eyewitnesses to Plaintiff's accident (*see* Pl. Rule 56.1 Stmt., at ¶ 83; Def. Rule 56.1 Stmt., at ¶ 83),[5] and there is some conflicting evidence in the record as to Plaintiff's own statements recounting how the accident took place. Operations Manager Gregory Doyle ("Doyle") states in a declaration made under penalty of perjury that Plaintiff told him that he "stepped" into the swash hole (*see* O'Neill Decl., Ex. 8), and Captain Maznio has submitted a sworn declaration in which he similarly states that Plaintiff told him that "he accidently stepped off the third floor of the starboard bunker deep tank" (O'Neill Decl., Ex. 9). Chief Mate Crane testified that, while he was helping Plaintiff out of the fuel tank following the accident, Plaintiff was "apologizing" and "blaming himself saying, you know, my fault, my fault." (O'Neill Decl., Ex. 2 (Transcript of the deposition of T. Crane, conducted May 13, 2008 ("Crane Dep.")), at 136.) On the other hand, at his own deposition, Plaintiff testified that "[his] foot slipped" and the next thing he remembered was "falling . . . [a]pproximately 35 feet." (Riggs Aff., Ex. 1 (Transcript of the deposition of Jason N. Scoran, conducted Aug. 6, 2008 ("Scoran Dep.")), at

---

[5] Although Duah had also entered the tank, he did not see how Plaintiff fell. (*See id.*; Riggs Aff., Ex. F (Duah Dep.), at 46.)

130-31), which matches the description of the accident contained in the accident report prepared by Maznio the day after the accident occurred (*see* Reply Affidavit of Peter Riggs in Further Support of Motion for Summary Judgment, sworn to June 18, 2009 ("Riggs Reply Aff.") (Dkt. 40), Ex. S ("It was reported that . . . Mr. Scoran slipped and fell thru deck opening.")).

There is also conflicting testimony as to the condition of the floor of the starboard tank level on which Plaintiff was walking when he fell.  Plaintiff testified that the surface was "wet with fuel oil" and difficult to walk on, although he was able to get traction, while Crane testified that the surface had a "sticky residue" on it from the fuel.  (*See* Riggs Aff., Ex. C (Scoran Dep.), at 126-27; *id.*, Ex. D (Crane Dep.), at 95-96.)  Duah testified that the floor was clean, not slippery, and contained no fuel residue, and Maznio testified that he did not recall having any problems with his footing on the first level of the tank.  (*See* O'Neill Decl., Ex. 4 (Duah Dep.), at 110-12; Ex. 3 (Transcript of deposition of Walter J. Maznio, conducted May 15, 2008 ("Maznio Dep.")), at 151.)

Finally, there is some conflicting evidence in the record regarding the number of hours Plaintiff worked in the 72 hours prior to his accident.  Under Coast Guard regulations, seamen are generally limited to working 36 hours within a 72-hour period.  *See* 46 U.S.C. § 8104 (2008); 46 C.F.R. § 15.710 (2009); *see also* Riggs Reply Aff., Ex. R (Coast Guard's G-MOC Policy Letter 4-00, Rev.1, dated Apr. 26, 2001), at 7).  Plaintiff states that he worked more than 36 hours in the 72 hours preceding his fall, and, as discussed further below, he suggests that this likely made him tired, which, in turn, likely contributed to his fall.

In support of his position that he worked excessive hours, Plaintiff points to a "Crew Work Hours" sheet, which served as a rough record of his time on the job, and on which he

logged 41 hours in the relevant 72-hour period.  (*See*  Pl. Rule 56.1 Stmt., at ¶ 127; Def. Rule

56.1 Stmt., at ¶ 127; *see also* Riggs Aff., Ex. L.)  Plaintiff states that this log was signed by

Captain Maznio and – as Defendants admit – was prepared for the Coast Guard (s*ee* Pl. Rule

56.1 Stmt., at ¶¶ 128-29; Def. Rule 56.1 Stmt., at ¶¶ 128-29), and argues that Defendants should

not now be permitted to challenge its accuracy (Mar. 16, 2010 oral argument; *see also* Plaintiff,

Jason N. Scoran's Reply Memorandum of Law in Further Support of Motion for Summary

Judgment, dated June 18, 2009 ("Pl. Reply Mem.") (Dkt. 41), at 4-6).  Defendants, however,

contend that, if all breaks, including meal time, coffee breaks, clothing changes, etc., taken by

Plaintiff during the 72-hour period preceding his accident were subtracted from his recorded

time, then it would be evident that Plaintiff's actual working hours during that period were under

the maximum permissible limit.  (*See* Def. Rule 56.1 Stmt., at ¶ 130.)

### B.      Procedural Background

Plaintiff commenced this action on November 14, 2007, by filing a Complaint seeking

damages for the injuries he sustained as a result of his fall.  (*See* Complaint, dated Nov. 13, 2007

("Compl.") (Dkt. 1).)  The Complaint asserts three claims:  (1) that Defendants were negligent

under the common law and/or the Jones Act, 46 U.S.C. § 30104; (2) that the vessel was

unseaworthy; and (3) that Plaintiff is entitled to maintenance, cure, and medical expenses for any

period for which he has been rendered disabled and unable to work as a result of the accident.

(*See generally* Compl.)

On January 7, 2008, Defendants filed an Answer asserting seven affirmative defenses.

(*See* Answer (Dkt. 8), at ¶¶ 150-56.)  Two of those affirmative defenses are at issue here,

specifically Defendants' first defense, which asserts that:

> [i]f Plaintiff was injured in the manner and for the reasons alleged
> in the Complaint, which is denied, [then] Plaintiff's injuries were
> caused and or brought about in whole or in part by his own
> negligence, fault, or lack of care, or by the negligence, fault or lack
> of care of others for whose negligence, fault or lack of care,
> Defendants are not responsible[;]

and Defendants' sixth defense, which asserts that:

> [w]hatever injuries Plaintiffs may have sustained at the time and
> place alleged in the [C]omplaint were caused solely, or contributed
> to, by acts or omissions of third parties over whom Defendants
> exercised no control.

(Answer, at ¶¶ 150, 155; Plaintiff, Jason N. Scoran's Amended Memorandum of Law in Support of Motion for Summary Judgment, dated Apr. 1, 2009 ("Pl. Mem.") (Dkt. 34), at 1.)

On August 29, Defendants sought leave to implead a third party, Camden First Aid Associates, on the ground that Plaintiff was jostled in an ambulance following his accident, and that this may have contributed to the severity of his injury. (*See* Letter to the Court from James E. Forde, Esq., dated Aug. 29, 2008 (Dkt. 17).) The Court denied Defendants' application, finding that Defendants had not shown good cause for impleading a new party at such a late stage of the litigation, and that allowing Defendants to do so would cause Plaintiff undue prejudice and substantially delay the resolution of the case. (Dkt. 22.)

On March 16, 2009, Plaintiff filed a motion for summary judgment (Dkt. 25), but, after a conference with the Court and Defendants' counsel, Plaintiff voluntarily withdrew that motion and, instead, on April 1, 2009, submitted an amended motion. (Amended Motion for Summary Judgment, dated Apr. 1, 2009 (Dkt. 30); Pl. Rule 56.1 Stmt. (Dkt. 31); Riggs Aff. (Dkt. 32); Pl. Mem. (Dkt. 33).) In his amended summary judgment motion, Plaintiff argues that the Court should dismiss Defendants' first and sixth affirmative defenses as raising no genuine triable

8

issues of fact.  (*See* Pl. Mem., at 1.)  Additionally, Plaintiff asks the Court to find that, without railings around the swash hole in the starboard bunker tank, the Overseas New Orleans was unseaworthy as a matter of law.  (*Id.*)

On May 18, 2009, Defendants filed their opposition to Plaintiff's amended summary judgment motion.  (Def. Mem. (Dkt. 35); O'Neill Decl. (Dkt. 37); Def. Rule 56.1 Stmt. (Dkt. 39).)  Plaintiff filed a reply memorandum on June 18, 2009.  (Riggs Reply Aff. (Dkt. 40); Pl. Reply Mem. (Dkt. 41).)

In a telephone conference with counsel on March 16, 2010, the Court invited oral argument from counsel as to the legal issues raised on Plaintiff's motion, and the Court heard and considered the arguments made.  In addition, the Court has now considered a letter submitted by Plaintiff's counsel, dated March 18, 2010, responding to certain remarks made by the Court during that conference.

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

### A.    Fed. R. Civ. P. 56

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), *i.e.*, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and the Court must view the record in the light most favorable to the non-movant by resolving all ambiguities and drawing all reasonable inferences in favor of that party, *Matsushita*, 475 U.S. at 587-88; *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir. 1995). Where, however, the non-movant has no evidentiary support for an essential element on which it bears the burden of proof, summary judgment is warranted. *Celotex*, 477 U.S. at 322-23; *Silver v. City Univ. of New York*, 947 F.2d 1021, 1022 (2d Cir. 1991); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").

**B.** **Local Civil Rule 56.1**

Under this Court's rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see also* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless

10

specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.") (emphasis omitted).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Summary judgment may only be granted where the Court is satisfied that the undisputed facts, as supported by the record, "'show that the moving party is entitled to a judgment as a matter of law.'"  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).

### C.     The Jones Act

The Jones Act provides the basis for negligence suits by seamen who have been injured on the job.  *See* 46 U.S.C. § 30104.  "A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 441 (2001) (citing *Plamals v. The Pinar Del Rio*, 227 U.S. 151, 155-156 (1928)).  In order to prevail on a Jones Act claim, the plaintiff must prove by a preponderance of the evidence:  "(1) that the plaintiff was acting in the course of his employment as a member of the vessel's crew at the time of his injury, (2) that the defendant was the plaintiff's employer, (3) that the defendant was negligent; and (4) that the defendant's negligence caused the plaintiff's injury." *Rofail v. United States*, No. 04-CV-2502, 2009 U.S. Dist. LEXIS 51540, at *16-17 (E.D.N.Y. June 18, 2009) (citations omitted).

A plaintiff's burden of proof in a Jones Act case is not a heavy one.  Indeed, courts have held that, under the Act, "a shipowner is liable for its employee's injuries if the employee proves by a preponderance of the evidence that the shipowner's 'negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'"  *Lombas v. Moran Towing & Transp. Co., Inc.,* 899 F. Supp. 1089, 1094 (S.D.N.Y. 1995) (quoting *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 523 (1957)); *see also Rofail*, 2009 U.S. Dist. LEXIS 51540, at *16 (noting that a Jones Act plaintiff "shoulders a lighter burden for establishing negligence than her counterpart on land would carry") (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 45 (2d Cir. 2004) (internal quotation marks and citations omitted)); *Evans v. United Arab Shipping Co. S.A.G.,* 4 F.3d 207, 210 (3d Cir. 1993) (describing standard of proof for causation and negligence under the Jones Act as "featherweight").  Furthermore, in Jones Act cases, "[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed."  *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir. 1991) (internal quotation marks and citation omitted).

### D.    Unseaworthiness

"Unseaworthiness" is not a statutory claim, but rather a claim under general maritime law, which dictates that a shipowner has an absolute duty to furnish a "seaworthy" ship. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549-550 (1960).  "An owner's failure to provide a ship, crew, and appurtenances reasonably fit for their intended service results in 'a species of liability without fault.'"  *Oxley*, 923 F.2d at 25 (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94 (1946)).  The doctrine of unseaworthiness "does not depend either on negligence . . . or on notice."  *Oxley*, 923 F.2d at 25 (internal quotation marks and citation omitted).  The Supreme

Court has undeviatingly held that an "owner's duty to furnish a seaworthy ship is . . . completely independent of his duty under the Jones Act to exercise reasonable care." *Mitchell*, 362 U.S. at 549; *see also Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498 (1971); *Rofail,* 2009 U.S. Dist. LEXIS 51540, at *19.

Thus, "[u]nder the doctrine of unseaworthiness the shipowner's duty to provide a safe ship is not mitigated by the exercise of reasonable care." *Saleh v. United* States, 849 F. Supp. 886, 894 (S.D.N.Y. 1994) (citations omitted). To prevail on an unseaworthiness claim, however, more must be shown than that an accident occurred while the seaman was performing his required duties. *See id.* at 894 ("the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy") (internal quotation marks and citation omitted). Whether a ship was unseaworthy at the time of an accident is "generally a question of fact to be determined by the jury." *Savard v. Marine Contracting, Inc.,* 471 F.2d 536, 543 (2d Cir. 1972). Further, a plaintiff must demonstrate causation – *i.e.*, "'(1) that the unseaworthiness played a substantial part in bringing about or actually causing the injury; and (2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Rofail,* 2009 U.S. Dist. LEXIS 51540, at *20-21 (quoting *Saleh,* 849 F. Supp. at 895).

### E.     <u>Comparative Negligence</u>

The rule of comparative negligence applies in both Jones Act actions and unseaworthiness actions. *Rofail,* 2009 U.S. Dist. LEXIS 51540, at *21 (citing *Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 596 (2d Cir. 1998)). "Thus, if a seaman's negligence has contributed to the cause of his injury, his recovery should be reduced proportionately."

*Williams v. U.S.*, 712 F. Supp. 1132, 1135 (S.D.N.Y. 1989).  Under the doctrine of comparative

negligence, "to reduce its liability, the defendant shipowner must prove [ . . . ] that the plaintiff

acted negligently by failing to exercise the care which a reasonably prudent man would have

exercised under the circumstances." *Lombas,* 899 F. Supp. at 1094 (citations omitted).  While a

"seaman's mere knowledge of a dangerous condition will not reduce the shipowner's liability,"

*id.,* a seaman's recovery may be reduced if it is shown that the seaman "'failed to adopt safer

alternative courses of action,' and the inquiry at trial should thus 'center[] on what choices were

available to [the Plaintiff] and how he exercised those choices,'" *Ammar v. United States*, 342

F.3d 133, 139 (2d Cir. 2003) (quoting *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 904

n.2 (2d Cir. 1982)) (alterations in original).

Although comparative negligence is an available defense in Jones Act actions, the related

defense of "assumption of risk" is not.  *See Tiller v. Atlantic C.L.C. Co.,* 318 U.S. 54, 58 (1943).

Moreover, the doctrine of comparative negligence cannot be invoked in situations "where the

violation by [a defendant] common carrier of any statute enacted for the safety of employees

contributed to the injury or death of [a plaintiff] employee."  45 U.S.C. § 53 (2008); 46 U.S.C.

§ 30104 (2008).  Whether a defendant's violation of such statute has "contributed to" the

plaintiff's injury is generally a decision to be left to the fact-finder.  *Rogers v. Missouri Pacific*

*Railroad Co.,* 352 U.S. 500, 508 (1957).

## II.     PLAINTIFF'S MOTION

### A.     Plaintiff's Challenge To Defendants' Comparative Negligence Defense

As noted above, Defendants assert in their Answer that Plaintiff's injuries were caused in

whole or in part by his own negligence, fault or lack of care.  (*See supra* at 7-8; *see also* Answer,

14

at ¶ 150.)  In seeking the dismissal of this comparative negligence defense, Plaintiff makes two arguments.  First, Plaintiff contends that, based on the record, Defendants are actually raising an "assumption of risk" defense, which is not available in Jones Act cases.  Second, Plaintiff argues that comparative negligence cannot be considered where – as he claims is the case here – the defendants' violation of a safety statute or regulation contributed to the employee's injury.  Neither of these arguments is persuasive on the record that has been presented.

### 1.    Plaintiff's Assumption of Risk Argument

Plaintiff first argues that Defendants' comparative negligence defense is really a disguised "assumption of risk" defense, which cannot be raised under the Jones Act.  (Pl. Mem., at 7-8.)  Plaintiff is correct that "assumption of risk" is not available as a defense to negligence under the Jones Act.  (*See supra* at 14.)  Similarly, the defense may not be raised under the guise of comparative negligence.  *See Tiller,* 318 U.S. at 58.

There is, however, a sharp distinction between an "assumption of risk" defense and a "comparative negligence" defense.  "Assumption of risk is 'the knowledgeable acceptance by an employee of a dangerous condition when and if such acceptance was necessary for the performance of his duties.'"  *Ammar*, 342 F.3d at 139 (quoting *Rivera v. Farrell Lines.,* 474 F.2d 255, 257 (2d Cir. 1973)).  Where an "assumption of the risk" defense is available and successful, the injured plaintiff is entirely barred from recovery.  *See Fonsell v. New York Dock Ry.,* 198 F. Supp. 332, 334 (E.D.N.Y. 1961).  On the other hand, "comparative negligence" is a doctrine under which recovery is reduced if the plaintiff is found to have been negligent and his own negligence contributed to his injury.  *Ammar,* 342 F.3d at 139 (citing *Rivera,* 474 F.2d at 257).  Comparative negligence does not act as a complete bar to recovery.  *See id.*

Here, Defendants argue that they have never raised an "assumption of risk" defense, but rather have always asserted that Plaintiff's own negligence caused his injuries in whole or in part (Def. Mem., at 7 (citing Answer, at ¶ 150).)  Beyond the language of their pleading, Defendants now cite to the record to highlight the fact that Plaintiff did not wear a harness or safety line while cleaning the starboard bunker tank, despite the equipment having been made available to him.  (*See* Def. Mem., at 10.)  In addition, Defendants point out that Plaintiff chose not to carry a large flashlight or lantern into the starboard bunker tank, even though those items were available to everyone on the ship.  (*See id.*, at 11.)  Defendants' expert opines that the safety hazards Plaintiff faced while cleaning the starboard tank could have been easily addressed by Plaintiff's using available safety equipment and taking reasonable precautions.  (Riggs Aff., Ex. M (Captain Jay Bolton, Report for Hill, Betts & Nash LLP, dated Jan. 30, 2009 ("Bolton Report")), at 12.)

Defendants' allegations plainly state a defense for comparative negligence, as is evident even from the reasoning of the principal case cited by Plaintiff in supposed support of its contrary position.  *See Fijal v. American Export Isbrandtsen Lines, Inc.,* 127 A.D.2d 167, 171 (1st Dep't 1987) (cited in Pl. Mem., at 8) (noting, in relevant part, that a defense based on plaintiff  "not using a safety line" would be within the realm of comparative negligence, as opposed to assumption of risk).  The circumstance described in *Fijal* as giving rise to a comparative negligence claim is precisely the circumstance presented here (an alleged failure to use an available safety harness), and, logically, the same analysis applies to a defense based on a plaintiff's alleged failure to afford himself adequate lighting in a dark space, when a flashlight that would have provided such lighting had been issued to him for his use.

16

The fact that Plaintiff may dispute whether harnesses were supposed to be worn by seamen during tank cleaning (*see* Pl. Reply Mem. at 18; Pl. Rule 56.1 Stmt., at ¶ 120 (citing Duah Dep., at 106-08)), or whether Plaintiff should have used a stronger flashlight (*see* Pl. Reply Mem. at 18), only demonstrates the presence of material triable issues as to Plaintiff's potential negligence.  Moreover, the conflict in the evidentiary record as to whether Plaintiff, by his own account, "stepped" or "slipped" into the hole (with the former suggesting a possible lack of attentiveness by Plaintiff and the latter suggesting a dangerous condition) also raises a factual issue that cannot be resolved on summary judgment.  *See Passantino v. States Marine Lines, Inc.,* 299 F. Supp. 1252, 1255 (S.D.N.Y. 1969) (finding after a bench trial that plaintiff was solely negligent for his injuries, where plaintiff had fallen between cargo containers because he was looking up despite still walking forward).

### 2.     Defendants' Alleged Violations of Safety Statutes or Regulations

Plaintiff further argues that his injury was caused, at least in part, by Defendants' violation of certain statutes and/or regulations that were designed to protect him, and that, for this reason, the doctrine of comparative negligence cannot apply.  Specifically, Plaintiff argues that Defendants violated Coast Guard regulation 46 C.F.R. § 32.02-10, which requires tank vessels to have guard rails on decks and bridges, and Coast Guard regulation 46 C.F.R. § 32.02-15, which requires tank vessels to properly protect exposed, dangerous places with rails or covers.  46 C.F.R. § 32.02-10 (1991); 46 C.F.R. § 32.02-15 (1991).  Plaintiff also argues that Defendants violated 46 U.S.C. § 8104 and 46 C.F.R. § 15.710, which limit the number of hours a seaman may work to no more than 36 hours in a 72 hour period.

17

a.     **Regulations Relating to Guard Rails**

Under Coast Guard regulations, "[a]ll tank vessels, except unmanned tank barges,

contracted for on or after July 1, 1969, shall have efficient guard rails or bulwarks on decks and

bridges." 46 C.F.R. § 32.02-10(a). The regulations further provide that, in such vessels, "[a]ll

exposed and dangerous places such as gears and machinery shall be properly protected with

covers, guards or rails in order that the danger of accidents may be minimized." 46 C.F.R.

§ 32.02-15. There is no question that these regulations were intended to ensure the safety of

seamen; indeed, all of the regulations falling under Title 46, subpart 32.02, are entitled "Safety

Requirements." 46 C.F.R. § 32.02.

In this case, Plaintiff contends that Defendants violated these two cited regulations, and

that the violations caused or contributed to his injuries. In particular, Plaintiff argues that the

regulations required Defendants to have railings both on "decks" and around "exposed and

dangerous places," that the level of the starboard bunker tank from which he fell qualifies as a

"deck," that the swash hole in the tank was an "exposed and dangerous place[]," and that his fall

would have been prevented by guard railings around the hole. (Pl. Reply Mem., at 12-13).

As to the argument that Plaintiff was on a "deck" when he fell, Plaintiff cites

Captain Maznio's deposition testimony, in which Maznio referred to the interior of the bunker

tank as a deck. (Pl. Reply Mem., at 11 (citing Maznio Dep., at 143).) Plaintiff also cites

Defendants' own expert report, in which, Plaintiff points out, the bunker tank is referred to as a

deck "no fewer than 8 times." (Pl. Reply Mem., at 11 (citing Bolton Report, at 6, 9, 10).)

Finally, Plaintiff cites to several dictionaries and maritime sources, generally defining the word

"deck" as either "a platform in a ship serving usually as a structural element and forming the

floor for its compartments" (Pl. Reply Mem., at 12 (citing http://www.merriam-webster.com/dictionary/deck)) or a "principal component of the ship's structure, consisting of a planked or plated surface, approximately horizontal, extending between the ship's sides, and resting upon a tier of deck beams" (*id.* (citing International Maritime Dictionary (2d ed.)). Although Defendants' opposition papers do not address Plaintiff's dictionary definitions (which Plaintiff did not introduce until his reply memorandum), the International Maritime Dictionary's definition cited by Plaintiff is sufficient to raise a question of fact as to whether the tank's level was in fact a "deck." This definition suggests that a deck must be (1) a "principal component of the ship's structure" that (2) "extend[s] between the ship's sides." It does not appear from the record that the tank platform from which Plaintiff fell had either of these attributes. At the very least, there exist disputed facts about whether the purported "deck" possessed these attributes, and – if not – whether it may still be a deck for the purposes of 46 C.F.R. § 32.02-10.

Moreover, Defendants maintain that the interior of the starboard tank should not be characterized as containing "decks" within the meaning of 46 C.F.R. § 32.02-10. When presented squarely with the question, Defendants' expert states, in a declaration, that the tank is a "separate entity from the 'decks' . . . on the vessel, and its component floors are referred to as 'levels.'" (Def. Mem., at 15 (citing Bolton Decl., at ¶¶ 7-10).) Although the credibility of this declaration may be undermined by the declarant's seemingly inconsistent usage of the word "deck" in his earlier expert report (*see* Pl. Reply Mem., at 11), questions of witness credibility must be addressed by the fact-finder. Defendants' expert's declaration, as well as the International Maritime Dictionary definition cited by Plaintiff, are sufficient to create a triable issue of fact as to whether Defendants violated 46 C.F.R. § 32.02-10.

Plaintiff also argues that Defendants were required, under 46 C.F.R. § 32.02-15, to have railings around the swash hole because, in Plaintiff's view, that hole – which itself had no removable cover – was an "exposed and dangerous place." (Pl. Mem., at 20.)  Defendants argue the opposite, maintaining that this "regulation makes no reference to swash holes or tank interiors," that "swash holes are not 'gears or machinery,'" and that a swash hole cannot be considered "exposed, [for] a seaman must enter the tank's interior specially, through a manhole, in order to be in the vicinity of the tank's . . . swash holes." (Def. Mem., at 15 (citing Bolton Decl., at ¶¶ 11-13).)  On this question, Defendants have the better argument, as the references in the regulation to "gears" and "machinery" and to "'exposed' places" make the regulation inapplicable to normally-closed fuel tanks.  *See Wilson v. Maersk Line, Ltd..,* No. 05 Civ. 6246, 2007 U.S. Dist. LEXIS 81135, at *2-3 (S.D.N.Y. Oct. 18, 2007).

In *Wilson*, the plaintiff fell through a cutout in the upper level of a ballast tank (a tank holding water), and argued that the defendant shipowner had violated 46 C.F.R. § 92.25-15 (a regulation for cargo and miscellaneous vessels, analogous to 46 C.F.R. § 32.02-15) by failing to install railings around the cutout hole.  *Wilson,* 2007 U.S. Dist. LEXIS 81135, at *2.  Noting, *inter alia,* that the regulation at issue specifically referred only to "gears" and "machinery," both of which, the Court reasoned, "are or include moving parts," the Court held that the regulation did not apply to a ballast tank.  *Id.* at *3.  The Court additionally found that "[t]he regulation, by its own language, limits itself to 'exposed' places" and that the tank and its internal structures were "not normally exposed," as no access was usually provided to the ballast tank, and, for anyone to enter the tank, a manhole cover would have needed to be unbolted.  *Id.*  The Court concluded that, as a matter of law, the regulation asserted by the plaintiff did not apply to the

tank involved in the case.  *Id*. at *3.  The facts presented in *Wilson* are closely analogous to those

presented here, and the Court's reasoning in that case is persuasive.  Accordingly, Plaintiff is not

entitled to summary judgment dismissing Defendants' comparative negligence defense based on

this regulation.

<strong>b.      Statute and Regulation Limiting Permissible Working Hours</strong>

Plaintiff also invokes the federal statute and Coast Guard regulations that limit the

number of hours a seaman may work.  The statute dictates:

> On a tanker, a licensed individual or seaman may not be
> permitted to work more than 15 hours in any 24-hour period, or
> more than 36 hours in any 72-hour period, except in an
> emergency or drill.  In this subsection, "work" includes any
> administrative duties associated with the vessel whether
> performed on board the vessel or onshore.

46 U.S.C. § 8104(n).  The relevant regulation then provides:

> In addition to prescribing watch requirements, 46 U.S.C.
> § 8104 sets limitations on the working hours of credentialed
> officers and crew members, prescribes certain rest periods, and
> prohibits unnecessary work on Sundays and certain holidays
> when the vessel is in a safe harbor.  It is the responsibility of
> the master or person in charge to ensure that these limitations
> are met.  However, under 46 U.S.C. § 8104(f), the master or
> other credentialed officer can require any part of the crew to
> work when, in his or her judgment, they are needed for:
> (a) Maneuvering, shifting berth, mooring, unmooring;
> (b) Performing work necessary for the safety of the vessel, or
> the vessel's passengers, crew, or cargo . . . .

46 C.F.R. § 15.710.

This statute and the accompanying regulation are properly characterized as "safety"

requirements, as the original purpose of the statutory enactment was to promote safety at sea,

rather than to regulate working conditions.  *See O'Hara v. Luckenbach S.S. Co.*, 269 U.S. 364,

21

367 (1926) (explaining statutory purpose of the Seaman's Act, particularly with respect to the hours and rest provision that was the predecessor to 46 U.S.C. § 8104); *see also Roy Cook & Sons, Inc., v. Allen,* 778 F.2d 1037, 1042-43 (5th Cir. 1985) (noting that when Congress undertook to reorganize Title 46 in 1983, it referred to the Title as maritime safety laws, which, among other things, related to "the protection of merchant seamen") (citation to House Report omitted).  Thus, if (1) Defendants permitted or required Plaintiff to exceed the statutory working-hours restriction, and (2) Plaintiff's excessive work hours caused or contributed to his injury, then, as explained above, Defendants may not avail themselves of a defense of comparative negligence.

As to the first prong of this analysis – which asks whether Plaintiff's work hours were, in fact, above the permitted maximum – Plaintiff points to two documentary records of his time which, according to Plaintiff, indicate that he worked either 41 hours or 45.5 hours within the 72-hour period preceding his accident (either five hours or nine-and-a-half hours more than the permitted maximum).  The time record that purportedly shows the greater number of hours (Plaintiff's "Overtime Hours" sheet) was not presented by Plaintiff with his moving papers, but rather only on reply (*see* Pl. Reply Mem., at 6; Riggs Reply Aff., Exs. O and P), and, thus, the Court will not consider it here, *see, e.g., United States v. Stein*, 452 F. Supp. 2d 230, 262 n. 126 (S.D.N.Y. 2006).[6]  The other time record on which Plaintiff relies, the "Crew Work Hours"

---

[6] In any event, the reply affidavit submitted by Plaintiff to explain this document (Riggs Reply Aff., Ex. O (Affidavit of Plaintiff, Jason N. Scoran, sworn to June 15, 2009 ("Scoran Aff."))) appears to rest on facts that are likely disputed.  For example, in using the Overtime Hours sheet to tally his hours over the three-day span, Plaintiff asserts that he worked 8 non-overtime hours on January 3, even though his paycheck for that time period reflects only 4 non-overtime hours.  (*Compare* Scoran Aff., at ¶ 17 (stating that Plaintiff worked 8 non-overtime hours on January 3), *with* Riggs Reply Aff., Ex. Q (indicating only 4 hours worth of base wages for the time period January 1 through January 4).)

sheet, was signed by Captain Maznio, and it shows Plaintiff's designated work hours to have

been 13.5 hours, 14 hours, and 13.5 hours, for each of the three days prior to the accident.  (*See*

Riggs Aff., Ex L.)  For their part, Defendants argue that the Crew Work Hours sheet should be

disregarded for purposes of establishing Plaintiff's work hours, because this evidence fails to

take into account Plaintiff's various breaks from work during his shift.  (*See* Def. Mem., at 18-

19.)  Defendants point out that both Maznio and Chief Mate Crane have confirmed through their

testimony that this record did not reflect Plaintiff's breaks for meals and certain other non-work

activities (such as clothing changes).  (*See id*. (citing Maznio Dep., at 91-93; Crane Dep., at 104-

05).)  Defendants argue that, if Plaintiff's breaks were subtracted from the total hours shown,

then the evidence would no longer show hours in excess of the statutory limit.  (*See* Def. Mem.,

at 19.)

        In oral argument before the Court, Plaintiff suggested that Defendants should not be

heard to raise an issue of fact based on testimony by their witnesses that contradicts the

information on the work sheet that Defendants, themselves, prepared specifically for the Coast

Guard as a record of their workers' hours.  In other words, Plaintiff appears to argue that, given

the nature and purpose of Defendants' written records, Defendants should be estopped from

arguing that those records do not accurately reflect Plaintiff's work hours.  At this time, though,

the Court need not resolve this legal issue, as the parties have not briefed the question of

estoppel and, in any event, Defendant has raised a triable issue of fact as to the second prong of

the necessary analysis – which inquires whether Plaintiff's alleged overtime hours caused or

contributed to his injury.

On the subject of causation, Plaintiff initially argues that, under the so-called "*Pennsylvania* Rule," a violation of a safety statute must shift the burden to Defendants to prove that the violation did *not* cause or contribute to the injury.  (Pl. Mem., at 18 (citing *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873) (holding that, in a situation where a shipowner has violated a statutory duty, "the burden rests upon the ship [to show] not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been")).)  Yet, as this rule creates a "drastic and unusual presumption . . . against the shipowner," *Wills*, 379 F.3d at 42 (internal quotation marks and citations omitted), the rule has not been held to be applicable in every type of case that involves every type of safety statute violation, *see id.*  Rather, the presumption of causation that results from the application of the *Pennsylvania* Rule only comes into play where there is an apparent nexus between the violation and the accident – in other words, where, "in light of 'wide experience in maritime navigation,' '[t]he logical probability' is 'that [the] fault of the ship is the cause' of the disaster." *Id.* (citing *Wilkins v. American Export Isbrandtsen Lines Inc.,* 446 F.2d 480, 485 (2d Cir. 1971)); *see also Director General of the India Supply Mission v. S.S. Maru,* 459 F.2d 1370, 1375 (2d Cir. 1972) (holding that application of the *Pennsylvania* Rule is "limited to the violation of a statute intended to prevent the catastrophe which actually transpired").

Thus, courts have applied the *Pennsylvania* Rule in cases where, for example, a vessel that violated a statute requiring it to use a foghorn was involved in a collision in dense fog, *The Pennsylvania*, 86 U.S. at 135-36; where a vessel scraped against a drawbridge that had not been built in accordance with statutorily-imposed requirements intended to provide a sufficiently-sized channel to allow passage, *see Complaint of Tug Helen B. Moran, Inc.,* 560 F.2d 527, 529

(2d Cir. 1977); and where a vessel sank after it had been unlawfully overloaded, *see Petition of Long,* 439 F.2d 109, 113 (2d Cir. 1971).  In contrast, the rule has not been extended to cases where the linkage between the violation and the injury has been less clear or direct.  *See, e.g., Director General of the India Supply Mission,* 459 F.2d at 1374-75 (declining to apply the rule where an unlawfully overloaded ship did not sink, but merely became stranded in shallow water); *Wills*, 379 F.3d at 42-45 (declining to extend the rule where ship violated law regarding monitoring of benzene emissions, and seaman died of cancer).

Similarly, in a case analogous to this one, the Second Circuit declined to apply the *Pennsylvania* Rule where a seaman died of a heart attack after working overtime for 17 consecutive days, including 19 overtime hours on the day of his death.  *Wilkins,* 446 F.2d at 482. In *Wilkins*, the court looked to the exceptions to the statutory prohibition of overtime work (*i.e.,* for "emergency or drill," *see* 46 U.S.C. § 8104(n)) and noted that the statute specifically permitted "more strenuous exertion than usual under more difficult and tension-producing conditions than ordinarily faced."  *Wilkins,* 446 F.2d at 485.  "Thus," the court reasoned, "the statute [was] obviously at odds with a view [t]hat in common experience any overtime work leads naturally and logically to bodily injury of the worker."  *Id.*  Rejecting the plaintiff's invocation of the *Pennsylvania* Rule, the court held that the jury was entitled to form its own evaluation as to what had caused the decedent's heart attack, as, in the court's view, it was not "common experience that any amount of overtime working in violation of the statute causes bodily injury to a seaman."  *Id.* at 484.  Based on *Wilkins* and the other precedent cited above, this Court concludes that it would not be appropriate to extend the *Pennsylvania* Rule to the facts presented here.

Accordingly, assuming that Plaintiff is able to demonstrate a violation of the work-hours statute and regulation, he will then bear the burden of demonstrating that this violation caused or contributed to his fall.  Accepting that he may need to bear the burden of proving proximate cause, Plaintiff next argues that his burden of doing so would be a light one.  (*See* Pl. Reply Mem., at 7-8 (noting that "[u]nder the Jones Act . . . a defendant is liable if its negligence played any part, no matter how slight, in causing the seaman's injuries"); *see also* Letter to the Court from Ronald G. Crispi, Esq., attorney for Plaintiff, dated March 18, 2010, at 2 (noting the "featherweight" burden for proving causation).)  Further, Plaintiff argues that there is a well-established causal link between fatigue and personal accidents, and that, "given plaintiff's excessive overtime hours, a reasonable inference of causation has been shown."  (Pl. Reply Mem., at 8-9 (citing *Gajewski v. United States,* 540 F. Supp. 381, 385 (S.D.N.Y. 1982), in which the Court refused to apply the *Pennsylvania* Rule but concluded, following a bench trial, that the evidentiary record supported a "justifiable inference" that plaintiff's excessive overtime was the proximate cause of his heart disease).)

Yet regardless of whether Plaintiff's hours, if excessive, may give rise to an inference that he was tired, and perhaps even a further inference that this made him more likely to fall, the Court cannot conclude, as a matter of law, that no jury could find in Defendants' favor on the question of causation.  There is no evidence in the discovery record that Plaintiff complained of fatigue on the day of the accident, and Plaintiff did not testify at his accident that fatigue actually caused his injuries.  Moreover, Defendants point to evidence suggesting that "Plaintiff had 8 hours' rest in the 12 hours preceding his accident; that he had 8 hours' rest in each of the three preceding nights; that he had additional rest breaks of ½ hour to 1½ hours between shifts (not

including meals); and that he had taken a break to eat breakfast in the hour immediately preceding his accident."  (Def. Mem., at 20 (citing Riggs Aff., Ex. L ("Crew Work Hours" sheet);  Def. Rule 56.1 Stmt., at ¶¶ 191-92; Scoran Dep., at 83, 97-98).)  Viewing the record as a whole, the Court finds that a genuine issue of material fact exists as to whether Defendants' alleged violation of the work hours limitation caused Plaintiff's fall and his injuries.  For this reason, the Court cannot find, as a matter of law, that Defendants are not entitled to proceed with their comparative negligence defense.

For all of the above reasons, Plaintiff's motion to dismiss Defendants' first affirmative defense is denied, insofar as that defense seeks to reduce Plaintiff's potential recovery to the extent his injuries were caused by his own negligent conduct.

### B.  Plaintiff's Challenge To Defendants' Third-Party Negligence Defense

Defendants' first and sixth affirmative defenses also seek to reduce Plaintiff's potential recovery to the extent his injuries were caused by the negligence of third parties not under Defendants' control.  Although Plaintiff purports to move against this third-party negligence defense, his papers do not actually address this aspect of his motion.  In the absence of any argument, the Court has no basis for finding that Plaintiff has sustained his burden of demonstrating the absence of any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The dismissal of Defendants' first and sixth affirmative defenses is therefore not warranted at this time.

### C.  Plaintiff's Argument That the Vessel Was Unseaworthy as a Matter of Law

Plaintiff argues that the Overseas New Orleans was unseaworthy as a matter of law because there were no railings surrounding the swash hole in the starboard bunker tank.

27

(Pl. Mem., at 22-25.)  Plaintiff notes that it is undisputed that the starboard bunker tank "had an eight by eight foot opening, completely unguarded, presenting the risk" of a 40-foot fall.  (Pl. Mem., at 24.)  According to Plaintiff, the lack of railings in the tank, and the attendant risk, rendered the ship unfit for its intended purpose because each time it went into the shipyard, the starboard bunker tank "necessitated multiple entries by ship personnel for positioning and repositioning of the Butterworth Machines."  (Pl. Mem., at 24.)  In support of its argument that railings were needed for the vessel to be considered seaworthy, Plaintiff cites *Krey v. U.S.*, 123 F.2d 1008 (2d Cir. 1941) (cited in Pl. Mem. at 24), in which the Second Circuit found a ship unseaworthy where it lacked handles or railings on a shower to be used by the crew at sea.  *See Krey,* 123 F.2d at 1010.

Defendants, however, argue that Plaintiff has not met his burden of proving the existence of an unseaworthy condition.  (Def. Mem., at 21-22 (citing *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944); *Oliveras v. Am. Export Isbrandtsen Lines, Inc.,* 413 F.2d 814, 816 (2d Cir. 1970)).)  Defendants state that the tank itself could only be entered through a manhole (Def. Mem., at 22 (citing Bolton Decl., at ¶¶ 12, 14)), and that it is often the case that "openings in tanks on different types of ships, including cargo ships, have no handrails around them."  (Def. Mem., at 22 (citing O'Neill Decl., Ex. 5 (Transcript of deposition of Gregory James Doyle, conducted October 3, 2008 ("Doyle Dep.")), at 72; Def. Rule 56.1 Stmt., at ¶ 228 (citing Bolton Decl., at ¶ 15)).)  Additionally, Defendants set forth evidence that the starboard bunker tank was only entered, at most, once every two to three years, by select crew members (*see* Def. Rule 56.1 Stmt., at ¶ 157; *see also supra* at n. 3), rendering the situation quite different from that presented in *Krey*, where the entire crew presumably used the showers on the ship on a daily basis.

The record certainly shows that it would have been feasible for Defendants to install railings around the swash hole in question, as, in fact, at the time of Plaintiff's accident, Defendants had already installed railings around a similar hole in another tank on the same ship, and had made plans for just such an installation in the starboard tank.  (*See* Pl. Rule 56.1 Stmt., at ¶¶ 63-65, 68, 140; Def. Rule 56.1 Stmt., at ¶¶ 63-65, 68, 140.)  The record remains unclear, however, as to whether such an installation would have been customary, and, as Defendants cite evidence that it would *not* have been (*see* Bolton Decl., at ¶ 15), the Court must resolve this ambiguity in their favor at this juncture, *see Matsushita*, 475 U.S. at 587-88; *Tomka*, 66 F.3d at 1304 ("[i]n assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party").  Like the question of feasibility, the issue of "custom" is relevant to determining whether a ship may be deemed fit for its intended purpose.  *See, e.g., Valentine v. St. Louis Ship Building Company.*, 620 F. Supp. 1480, 1483 (E.D. Mo. 1985) (holding that a ship was not unseaworthy for failure to have railings around a temporarily open hatch on the bow, where it was neither customary nor practicable to put a railing around the opening).

In the face of evidence that the starboard bunker tank on the Overseas New Orleans was entered only rarely, that safety harnesses were available for the seamen who entered that tank, and that such tanks may not typically be equipped with interior railings, the Court cannot determine that the ship, in this case, was unseaworthy as a matter of law.  Seaworthiness is "generally a question of fact to be determined by the jury," *Savard v. Marine Contracting, Inc.*, 471 F.2d 536, 543 (2d Cir. 1972), and, here, material disputed issues remain on this question.  Therefore, this last aspect of Plaintiff's summary judgment motion is also denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for partial summary judgment

(Dkt. 30) is denied in all respects.

Dated: New York, New York
    March 31, 2010

SO ORDERED

_DEBRA FREEMAN_
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Thomas Francis Cerussi, Esq.
Cerussi & Spring
One North Lexington Avenue
White Plains , NY 10601

Gordon Scott Arnott, Esq.
James Edward Forde, Esq.
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street
26th Floor
New York , NY 10281-1003